# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| MATTHEW ROGERS,<br>by his next friend and guardian,<br>KAREN BROWN,<br><br>      Plaintiff,<br><br>v.<br><br>JON WEIZENBAUM, in his official capacity as INTERIM COMMISSIONER, TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES, and KYLE JANEK, in his official capacity as EXECUTIVE COMMISSIONER, TEXAS HEALTH AND HUMAN SERVICES COMMISSION,<br><br>      Defendants. | Cause No.3:12-cv-4055_____ |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT**

# TABLE OF CONTENTS

**INTRODUCTION**..................................................................................................1

**PARTIES** ...........................................................................................................8

**JURISDICTION AND VENUE**............................................................................9

**BACKGROUND FACTS** ....................................................................................9

I.     Matthew Rogers and His Medical Condition........................................................ 9

II.    The Texas Medicaid Program............................................................................. 10

III.   Defendants' Decision to Terminate Services to Matthew in His Home.............. 12

IV.    Federal and State Law Prohibit Unnecessary Institutionalization ...................... 16

V.     Defendants' Violation of Matthew's Due Process Rights ................................... 18

VI.    Matthew's Income and Inability to Post Bond ................................................... 20

**COUNT I:  VIOLATIONS OF THE ADA AND SECTION 504**......................20

**COUNT II:  VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983**..........21

**PRAYER FOR RELIEF**....................................................................................22

**VERIFICATION**..............................................................................................25

Matthew Rogers ("Matthew"), by his next friend and guardian Karen Brown, complaining of and against Jon Weizenbaum, in his official capacity as Interim Commissioner of the Texas Department of Aging and Disability Services ("DADS"), and Dr. Kyle Janek, in his official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC") (collectively, "Defendants"), alleges as follows:

# **INTRODUCTION**

1.      Karen Brown brings this action on behalf of her 21 year old medically fragile son, Matthew, whom Defendants have indicated that they will deprive, on October 15, 2012, of the private-duty STAR+PLUS nursing services he needs to survive.

2.      Matthew has been medically diagnosed with, among other things, massive brain damage, spastic quadriparesis, intractable epilepsy, frequent seizure clusters, severe pulmonary restriction, chronic lung disease, difficulty controlling secretions leading to aspiration, static encephalopathy, cortical blindness, hypertonia, and global developmental delay.  Matthew is also non-verbal and non-ambulatory, making it impossible for him to communicate any of his medical needs.

3.      Dr. John Foster, Matthew's primary care physician since his birth twenty-one years ago, has stated unequivocally in correspondence submitted to Defendants and attached to this Complaint as Exhibit A that Matthew would be unlikely to survive long in any kind of nursing facility because "his care is too complicated" and "[h]e has had a history of changing his clinical status in minutes not hours."  He thus requires for his survival "meticulous 24 hour a day, minute by minute attention from his home nurses[.]"

4.      Dr. Andrew Gelfand, Matthew's pediatric pulmonologist for more than ten years until May 2010 fully supported Dr. Foster's assessment in his own June 13, 2012,

correspondence directed to Defendants and attached to this Complaint as Exhibit B.  Dr. Gelfand further observed that Matthew's placement into a long term care facility would "ultimately lead to a much deteriorated medical state as well as death in a fairly . . . short period of time."  Dr. Gelfand expressly asserted that Matthew "needs at least one on one care 24 hours per day" from his nurses in part because Matthew "is unable to clear his own secretions including saliva and mucous and if he is not continuously monitored he will likely suffer an aspiration event, which will lead to lengthy hospitalization and even possibly death."  Dr. Joseph Viroslav, Matthew's current adult pulmonologist has expressly agreed in correspondence submitted to the Defendants and attached to this Complaint as Exhibit C that the level of care Matthew has received up to this point has kept him in relatively good health and should be continued.

5.      Dr. Pradeep Modur, Matthew's neurologist for the past three years, reiterated Matthew's need for one-on-one nursing care in June 13, 2012, correspondence submitted to the Defendants and attached to this Complaint as Exhibit D, noting that the complexity and frequency of Matthew's seizure cluster episodes rendered "close supervision and observation" and "one-on-one nursing care" imperative and transfer to a nursing facility medically inappropriate.

6.      Dr. Mauricio Delgado, who treated Matthew in the Neurology Clinic of Texas Scottish Rite Hospital for Children in Dallas for approximately 17 years confirmed in correspondence submitted to the Defendants and attached to this Complaint as Exhibit E that Matthew had required "nursing care around the clock to prevent seizure and respiratory illnesses requiring emergency interventions and hospitalization."

7.      The views of Matthew's treating physicians were not a new development or surprise to DADS.  Indeed, in a nursing assessment for CLASS, a home healthcare program run

by Defendants, the evaluating Registered Nurse had clearly indicated that "a licensed nurse or Matthew's responsible adult/mother must be present at all times to continuously assess and determine Matthew's ongoing needs.  Failure to provide Matthew with a skilled nurse or his mother who is very knowledgeable of his care would place Matthew's health and safety in jeopardy."

8.      Nevertheless, despite their full awareness of the unambiguous medical assessments of Matthew's personal physicians, three of whom had worked with Matthew for 10 years, 17 years, and his whole life respectively, and their further awareness of relevant nursing assessments, Defendants determined that they would terminate funding in its entirety for Matthew's continued care at home because one member of their clinical staff had determined that Matthew's "health and safety can be protected in an available living arrangement other than the STAR+PLUS Program, specifically in a state supported living center."  *See* Exhibit F to this Complaint.

9.      Dr. Lisa Glenn, the member of Defendants' clinical staff responsible for this determination (the "DADS Determination"), admitted that she based the determination on a visit to Matthew in his home which lasted no more than one hour and forty minutes.  *See* Exhibit G to this Complaint.  On the basis of this necessarily limited review, Glenn originally concluded that a nursing facility could care for Matthew's needs.  *Id*.  After reviewing the statements of Matthew's treating physicians, Glenn recognized that she had erred dangerously in this regard, admitting that she "agree[d] that the level of care that Dr. Gelfand states that Mr. Rogers requires would be unlikely to be received in a nursing facility and that Mr. Rogers' health and safety cannot be protected in that setting."  Exh. F.

10.     Despite her nearly fatal mistake and despite her realization that the combined unanimous medical assessments of Matthew's lifelong treating physicians carried dispositive weight as compared with her hour and forty minute visit with Matthew, Dr. Glenn inexplicably indicated that the Denton State Supported Living Center (the "DSSLC") could care for Matthew. Ex. F.  She admitted that she based this bare and unsupported assertion on nothing but one "tour" of the DSSLC and a conversation with the DSSLC medical director, who had never visited Matthew and who had no independent knowledge of his medical condition.  *Id*.  She gave no indication of how the DSSLC could care for Matthew's extensive and complicated medical needs or how it could perform more successfully than any other nursing facility in this regard. She also gave no indication that the DSSLC could provide the twenty-four hour minute-by-minute licensed nursing care that Matthew's treating physicians unanimously prescribe as medically required.

11.     In fact, the DSSLC and other DADS state supported living centers have provided such woefully deficient medical care to residents that the Department of Justice ("DOJ") was forced to take on a monitoring role in 2009 pursuant to a settlement agreement.  In its June 14, 2012, monitoring report on the DSSLC, the  DOJ observed that (1) "[DSSLC] did not have effective policies and procedures that help ensure that standard of care practice is followed, and [DSSLC's] policy for medical services is not consistently adhered to by the clinical staff[;]" (2) "[DSSLC's] self-assessment reported that DSSLC was not in substantial compliance with any Provision of [the section of the Settlement Agreement concerning the care of At-Risk Individuals][;]" (3) "there was apparent underrating of individuals on their risks" and particularly for individuals at risk of choking and/or aspiration; (4) one DSSLC resident had recently died from asphyxiation of gastric content, which the DOJ found "unacceptable" and two more had

4

recently died from pneumonia, and pneumonia and sepsis, respectively, concerning which deaths

the DOJ expressed that it "has concerns[;]" (5) DSSLC had failed to comply with *even one* of the

six provisions of Section M of the Settlement Agreement concerning Nursing Care which, as a

general matter, was designed to ensure that "[e]ach Facility shall ensure that individuals receive

nursing care consistent with current, generally accepted professional standards of care[;]" and (6)

DSSLC had failed to demonstrate that "Nursing Policies, Procedures, and Protocols had

translated into actual nursing practices sufficient to meet individuals' health care needs."

12.     On July 31, 2012, Commissioner Chris Traylor admitted to the Senate Committee

on Health and Human Services that (1) "[a]t this time, none of the [state supported living

centers] have achieved substantial compliance in any of the 20 broad areas [encompassed by the

Settlement Agreement with the DOJ[,]" including "quality assurance," "minimum common

elements of clinical care," "identifying and addressing at-risk individuals," "medical care,"

"nursing care," and many others; and (2) DSSLC had only achieved substantial compliance with

16% of the 161 sub-requirements of the Settlement Agreement and was only even making

progress with respect to a mere 42% of those sub-requirements.

13.     The DOJ monitoring findings and Defendants' own admissions thus confirm the

unanimous views of Matthew's treating physicians that the DSSLC cannot address his many

complex medical needs and that he would not survive in such a setting.

14.     The DSSLC has not historically and does not now provide twenty-four hour a day

one-on-one skilled nursing care to any of its residents.

15.     The STAR+PLUS services which Defendants intend to terminate stem from a

Medicaid-funded waiver program the purpose of which is to provide medical assistance to

persons with mental retardation in the community and prevent the individual's admission to an

institution.  Services available through the STAR+PLUS program include private nursing services such as the services Matthew currently receives and has received from Defendants continuously since he turned 21.  General Appropriations Act, 82nd Legislature, Regular Session, 2011, Special Provisions Relating to All Health and Human Services Agencies, Section 56 ("Section 56") (attached as Ex. H to this Complaint), specifically allows Defendants to supplement Medicaid funding with Texas general revenue funds as necessary to care for individuals in the home.

16.     As explained in greater detail below, the annual cost of caring for a resident with even average needs at the DSSLC is $239,440.00.  Even if the DSSLC could take care of Matthew's many complex medical needs, which it cannot, care for Matthew in that facility would cost far more than caring for an average resident because Matthew would require frequent hospitalizations and emergency interventions for the limited time in which he could survive at all.  Matthew's mother has proposed a plan of care which (1) would keep Matthew at home, (2) would comply with the directives of Matthew's treating physicians, and (3) would cost only $222,438.30 per year.   Defendants have ignored the proposals of Matthew's mother repeatedly, including a communication from Matthew's counsel on October 8, 2012, reiterating this proposal to multiple representatives of the Defendants.

17.     No hearing of any kind has been held by Defendants with respect to their conclusion that Matthew's health and safety can be protected in the DSSLC much less that the DSSLC could serve Matthew's needs more cheaply than his care at home, despite the fact that (1) Rider 56 determinations in this case and others are decisive as to whether Medicaid funds will be made available and Medicaid determinations are statutorily subject to fair hearing requirements (42 U.S.C. § 1396a(a)(3); Tex. Admin. Code §§ 353.2, 353.202, 357.3), and (2)

this Court held unambiguously on February 10, 2010, in *Knowles v. Horn*, Civ. No. 3:08-cv-1492-K, that "[b]ecause the determinations made with respect to the various funding sources are inseparable, the Medicaid fair hearing requirements apply to [Section 56][1] state general revenue funds." 2010 WL 517591, *6 (N.D. Tex. Feb. 10, 2010). Defendants have ignored this Court's ruling on this point and have denied Matthew the required fair hearing.

18.     Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132, also prohibits public entities from discriminating against qualified persons with disabilities in providing services. Similarly, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a), prohibits recipients of federal funds from discriminating against qualified persons with disabilities. The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization. "[T]he prohibition of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Consistent with this federal law, Texas state law in the form of the Persons with Mental Retardation Act (the "PMRA"), Tex. Health & Safety Code §§ 591.005 and 592.032, expressly contemplates an individual's right to receive needed services in an environment that is "the least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."

---

[1] At the time, Section 56 was known as Rider 45.

19.     In this case, Defendants have provided Matthew with home-based services since he was born through various Medicaid-funded programs, and have now, in disregard of all of the foregoing facts and legal standards, resolved to terminate his home-based services *in their entirety*, which effectively condemns Matthew to die quickly.

20.     Because the DADS Determination does not satisfy the foregoing legal standards, has not provided a fair hearing to Matthew or reasonably considered or addressed the facts related to Matthew's health and safety, and because the DADS Determination effectively condemns Matthew to a quick death, Matthew's mother, Karen Brown, brings this action on Matthew's behalf, seeking to enjoin the DADS Determination, continue the funding for Matthew's home care that is essential to his survival, and obtain declaratory relief that (a) Defendants' denial of funding for nursing services for Matthew Rogers in his home violates 42 U.S.C. § 12132 and 29 U.S.C. 794(a) and implementing regulations, 28 C.F.R. §§ 35.130(d) and 41.51(d).

## **PARTIES**

21.     Plaintiff Karen Brown is the parent and natural guardian for her disabled adult child, Matthew Rogers.  Plaintiff and her son reside in Dallas County.

22.     Defendant Jon Weizenbaum is the Interim Commissioner of the Texas Department of Aging and Disability Services.  DADS is a state agency with principal offices at 701 West 51st Street, Austin, Texas 78714.  The agency and Interim Commissioner Weizenbaum may be served at that location.  Defendant Kyle Janek is the Executive Commissioner of the Texas Health and Human Services Commission.  HHSC is a state agency with principal offices 4900 North Lamar Blvd., Austin, Texas 78751.  The agency and Executive Commissioner Janek may be served at that location.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331because it arises under the Constitution and laws of the United States.  Declaratory relief

is authorized under 28 U.S.C. § 2201.

24.     Plaintiff's discrimination claims are brought pursuant to, *inter alia*, 42 U.S.C.

§ 12133, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983.  Plaintiff's due process claims are brought

pursuant to, *inter alia*, the United States Constitution and 42 U.S.C. § 1983.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in

this district.

## BACKGROUND FACTS

### I.     Matthew Rogers and His Medical Condition.

26.     Matthew, a severely disabled twenty-one year old adult, has been medically

diagnosed with, among other things, massive brain damage, spastic quadriparesis, intractable

epilepsy, frequent seizure clusters, severe pulmonary restriction, chronic lung disease, difficulty

controlling secretions leading to aspiration, static encephalopathy, cortical blindness, hypertonia,

and global developmental delay.  Matthew is also non-verbal and non-ambulatory, making it

impossible for him to communicate any of his medical needs.  Matthew is eligible for Medicaid

services.

27.     As a result of his medical conditions, and as stated above in paragraph 3, Matthew

requires round-the-clock skilled nursing care or he will not survive.  Dr. John Foster, Matthew's

primary care physician since his birth twenty-one years ago, has stated unequivocally in

correspondence submitted to Defendants and attached to this Complaint as Exhibit A that Matthew would be unlikely to survive long in any kind of nursing facility because "his care is too complicated" and "[h]e has had a history of changing his clinical status in minutes not hours." As explained in paragraph 4 above, Dr. Gelfand, Matthew's pediatric pulmonologist for more than ten years up until May 2010, further observed that Matthew's placement into a long term care facility would "ultimately lead to a much deteriorated medical state as well as death in a fairly . . . short period of time." *See* Ex. B. As related in paragraphs 5-7 above, Matthew's other treating physicians and a nursing assessment done for evaluating Matthew's needs in relation to Defendants' Medicaid waiver services programs unanimously agree with these evaluations. *See* Exs. C-E.

28.     As further explained in paragraphs 3 to 7 above, Matthew can only receive the continuous one-on-one monitoring and care by licensed nurses deemed medically necessary by his treating physicians in his home. Institutionalization would be fatal.

## II.     The Texas Medicaid Program

29.     The Medicaid program is a joint federal and state funded program enacted to provide necessary medical assistance to needy aged or disabled persons and families with dependent children, whose income and resources are insufficient to meet the cost of care. 42 U.S.C. § 1396. States choosing to participate in the Medicaid program must operate the program in conformity with federal statutory and regulatory requirements. 42 U.S.C. § 1396a.

30.     Each State participating in the Medicaid program must submit a Medicaid plan to the Secretary of the United States Department of Health and Human Services for approval. 42 U.S.C. § 1396. Each State must also designate a single-state agency to administer and/or

supervise the administration of the State's Medicaid plan.  42 U.S.C. § 1396a(a)(5).  HHSC is the Medicaid single-state agency in Texas.

31.     Through a federally approved waiver, states have the option of covering home and community-based services for persons who would otherwise require institutional care that would be paid by Medicaid.  42 U.S.C. § 1396n(c)(1).  Under the waiver authority, the secretary of HHSC may grant waivers of specified requirements such as service limitations that are otherwise applicable to the State's Medicaid plan.  42 U.S.C. § 1396n(c)(3).  Medicaid home and community-based waiver programs enable states to provide the level of services a person would typically receive in an institutional setting in his or her home or some other community setting.  42 U.S.C. § 1396n(c)(1).

32.     Texas has implemented federally approved home and community-based-care waiver programs in its Medicaid program.  HHSC has delegated to DADS the authority to operate home and community-based Medicaid waiver programs for persons requiring either a nursing level of care or an Intermediate Care Facility for the Mentally Retarded ("ICF/MR") level of care.

33.     Defendants operate a federally approved home and community-based waiver program for Texans with mental retardation called the STAR+PLUS waiver.  This waiver provides medical assistance to Medicaid recipients with physical or mental disabilities in the home and other community-based placements through the use of managed care organizations without regard to age.  The purpose of the STAR+PLUS waiver program is to provide medical assistance to persons with physical or mental disabilities in the community as an alternative to institutional care.  STAR+PLUS program services are designed to ensure the individual's health and welfare in the community and prevent the individual's admission to an institution.  Services

available through the STAR+PLUS waiver program include the private duty nursing services Matthew now receives in his home.

## III.   Defendants' Decision to Terminate Services to Matthew in His Home.

34.     Defendants have provided Matthew with Medicaid-funded services in his home since he was born.  The program currently serving Matthew, the STAR+PLUS program, has a Cost Cap, which amounts to "200 percent of the reimbursement rate that would have been paid for [the] individual to receive services in a nursing facility."  Section 56, part (a)(7).  On information and belief, Defendants have calculated that figure for all recipients of STAR+PLUS services as $143,941.00.

35.     On or about April 20, 2012, medical professionals from Molina Healthcare, a provider authorized by Defendants to provide STAR+PLUS nursing services, determined that Matthew required twenty-four hour care and that, in light of the complexities and risks involved, a licensed nurse must provide this care.  The conclusions of these professionals were submitted in an Individual Service Plan (the "ISP") to Defendants in May 2012.

36.     Upon receiving the May 2012 ISP, Defendants determined that (1) implementing the ISP would cause Matthew's cost of care to exceed the Cost Cap, and (2) because Matthew's cost of care would now exceed the Cost Cap, DADS would terminate provision of STAR+PLUS services, unless it made the decision to allocate state general revenue funds to cover the amount by which Matthew's cost of care exceeded the STAR+PLUS Cost Cap.

37.     Section 56 authorizes Defendants to use such general revenue funds "to pay for services if: (i) the cost of such services exceeds the individual cost limit specified in a medical assistance waiver program  . . .; (ii) federal financial participation is not available to pay for such services; and (iii) the department or commission determines that: (a) the person's health and

safety cannot be protected by the services provided within the individual cost limit established for the program; and (b) there is no other available living arrangement in which the person's health and safety can be protected at that time, as evidenced by: i) an assessment conducted by clinical staff of the department or commission; and ii) supporting documentation, including the person's medical and service records." *See* Ex. H.

38.    As there was and is no dispute that Section 56 factors (i), (ii), and (iii)(a) apply to Matthew, Defendants arranged to have one member of their clinical staff assess Matthew for purposes of evaluating the impact of Section 56 factor (iii)(b).  On the basis of a unilateral and cursory determination by that clinical staff member after a mere one hour and forty minute visit on May 29, 2012, to Matthew's home—a determination that the staff member herself later admitted was fatally flawed and which, in any event, is flatly controverted by the unanimous statements of Matthew's own long-standing treating physicians—Defendants have decided to terminate Matthew's home-based services on October 15, 2012, without opportunity for fair hearing or other appeal.

39.    As explained in paragraph 9 above, in her page and a half long original report, dated June 4, 2012, Dr. Lisa Glenn, the clinical staff member responsible for evaluating Matthew, expressed her determination, shorn of any meaningful analysis, that "the current health needs of Matthew Rogers can be served in a nursing facility which is able to meet his respiratory care needs, his health can be protected and his prognosis in such a facility would be similar to his prognosis in his current home setting."  Ex. G.  Dr. Glenn gave no account of how such a facility could possibly meet Matthew's many complex medical needs.  She did not consult with Matthew's treating physicians in reaching her unilateral conclusion.

13

40.     On June 5, 2012, Defendants sent a letter to Matthew informing him that, in light of Dr. Glenn's conclusion, they did not consider him a proper candidate for state general revenue funding under Section 56.  Ex. G.

41.     On June 20, 2012, Elise Mitchell, counsel for Matthew, submitted additional information to Defendants, including the treating physician letters attached to this Complaint as Exhibits A through E, for the purpose of demonstrating that Dr. Glenn's conclusions ran directly contrary to the unanimous statements of the treating physicians and would lead to Matthew's quick death, if implemented.

42.     On September 5, 2012, Defendants sent further correspondence to Matthew notifying him that his life-sustaining home nursing services would be terminated as of October 15, 2012.  Ex. F.  By way of justification for their decision in this regard, Defendants attached an August 14, 2012, memorandum from Dr. Glenn, in which she acknowledged that, after reviewing the statements of Matthew's treating physicians, she realized that she had made a near fatal error in her original June 4, 2012, submission.  Now she recognized, contrary to her original recommendation, that she "agree[d] that the level of care that Dr. Gelfand states that Mr. Rogers requires would be unlikely to be received in a nursing facility and that Mr. Rogers' health and safety cannot be protected in that setting."  Inexplicably, however, she now stated that Defendants should "[p]ursue assessment of Mr. Rogers for placement in a state supported living center."  She did not contact Matthew's treating physicians in connection with this new recommendation.  Neither did she provide any analytical support for the recommendation.  On the contrary, she admittedly based her recommendation entirely on one "tour" of the DSSLC facility and a conversation with that facility's medical director—an individual who had never met, much less done an independent medical evaluation of, Matthew.

14

43.     As explained in paragraphs 11-13 above, the DSSLC is utterly unequipped to address Matthew's many complex medical needs.  This Court found in its February 10, 2010, opinion in *Knowles v. Horn*, Civ. No. 3:08-cv-1492-K, 2010 WL 517591, *2 (N.D. Tex. Feb. 10, 2010), that the DSSLC did not provide twenty-four hour one-on-one nursing care to any of its residents, but rather that the "nurse to patient ratio is—at best—one to six; however, that ratio would likely be closer to one to twenty-five."  On information and belief, that ratio has not improved at the DSSLC since February 10, 2010.

44.     Furthermore, Matthew's cost of care at the DSSLC would actually *exceed* his cost of care at home with the proper STAR+PLUS waiver services.  The cost of care for a DSSLC resident with even *average* needs is $656.00 per day or $239,440.00 per year.  Even if the DSSLC could care for Matthew's many complex medical needs at all, which it cannot, it would have to expend far more in the process than it would have to expend on a resident with average needs.  As his treating physicians have indicated, he would need frequent hospitalizations and emergency interventions for the limited time in which he could survive at all.  *See, e.g.*, Exs. A, B, D.  Matthew's mother, Karen Brown, submitted a proposed budget to the Defendants which (1) would keep Matthew at home, (2) would comply with the directives of Matthew's treating physicians, and (3) would cost only $222,438.30 per year.[2]  As explained above, the Defendants have ignored the proposals of Matthew's mother repeatedly, including a communication from

---

[2] Under the proposed plan, Matthew would receive 18 hours of licensed nursing care at home per day and his mother would work with a personal attendant in furnishing care for six night-time hours.  As noted in paragraph 7 above, medical professionals have determined that Matthew's mother, who has been fully involved with his care since his birth and thus has a comprehensive awareness of his many complex medical needs and any warning signs as to possible complications, can address Matthew's medical needs for a few hours with the help of personal attendants who have worked with Matthew for many years and follow his mother's instructions to the letter.

Matthew's counsel on October 8, 2012, reiterating this proposal to multiple representatives of the Defendants.

## IV.   Federal and State Law Prohibit Unnecessary Institutionalization

45.     Even if the DSSLC or some other state supported living center could somehow serve Matthew's many medical needs, which is demonstrably not the case, forcing Matthew to seek such services in such an institution instead of in his home would violate the ADA, 42 U.S.C. § 12132; Section 504, 29 U.S.C. § 794(a); and the Texas PMRA, Tex. Health & Safety Code §§ 591.005 and 592.032.

46.     Title II of the ADA prohibits public entities from discriminating against qualified persons with disabilities in the delivery of services.  Section 504 prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  Policies and practices that have the effect of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under these Acts, under the holding of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999).

47.     Under 28 C.F.R. § 35.130(d), implementing Title II of the ADA, public entities must administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  This same requirement applies to recipients of federal funds under the regulations implementing Section 504 (28 C.F.R. § 41.51(d)).

48.     The purpose of the Texas PMRA is to preserve and promote the rights of individuals with mental retardation to live at home.  Tex. Health & Safety Code, §§ 591.002(d), 592.013(3).  The PMRA expressly contemplates an individual's right to receive needed services in an environment that is "least confining for a client's condition . . . and provided in the least

intrusive manner reasonably and humanely appropriate to the person's needs." *Id.* at §§ 591.005(1) and (2), 592.032.

49.     The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization: "[T]he prohibition of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."

50.     Defendants' clinical staff member never questioned the appropriateness of community placement or that Matthew's home would constitute his least restrictive or confining environment.  Indeed, placement in the home and in the community is presumptively the least restrictive or confining placement.

51.     Neither Matthew himself nor Karen Brown, his mother, opposes Matthew's care in his home.  In fact, Ms. Brown drafted a lengthy letter precisely in an effort to persuade Defendants not to take the fatal step of forcing Matthew out of his home and into an institution. In this letter, Ms. Brown noted that "[d]espite his severe brain damage, Matthew does interact with his environment, community, and extended family.  He attends adaptive PE at Richland College, occasionally hands out dog treats at a local pet store with his certified companion dog, participates in a Buddy baseball league and enjoys other outings as he is able."

52.     Defendants can reasonably accommodate the provision of the necessary services to Matthew in his home.  Section 56 specifically allows Defendants to supplement Medicaid with

the necessary general revenue funds to care for individuals in the home.  Defendants did not base their decision on any indication that funds were unavailable to care for Matthew in his home or even on the suggestion that Matthew's care in an institution would cost less than Matthew's care at home.  On the contrary, they based the decision entirely on (1) the bare fact that Matthew's care in the home would exceed a self-imposed Cost Cap, and (2) the unilateral determination by one of their clinical staff members that the DSSLC could provide services to Matthew, based on an hour and forty minute visit to Matthew's home, one "tour" of the DSSLC, and a conversation with the DSSLC Medical Director—an individual who had no independent knowledge whatsoever of Matthew or his medical conditions.  This unilateral determination is directly contrary to the unanimous written views of Matthew's treating physicians who have more than 50 years of combined experience in addressing Matthew's many complex medical conditions.

53.     In fact, as detailed in paragraph 44 above, even if Defendants could care for Matthew in the DSSLC, which they cannot, it would cost them more to do so than to care for him in his own home, even without taking into consideration the added expense of constant infirmary care and emergency hospitalizations.

54.     Consequently, Defendants have impermissibly discriminated against Matthew in violation of the ADA, Section 504, and the PMRA.

## V.     Defendants' Violation of Matthew's Due Process Rights

55.     Pursuant to 42 U.S.C. § 1396a(a)(3), any "State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  Texas has implemented this requirement with respect to STAR+PLUS. *See, e.g.*, Tex. Admin. Code §§ 353.2, 353.202, 357.3.

56.     In its September 5, 2012, correspondence to Matthew , DADS announced its determination to terminate all home-based services to Matthew and did not offer Matthew the opportunity for a fair hearing or any other mechanism for review of its determination.

57.     Section 56 dramatically impacts the financial and legal considerations that Defendants must use to make their determinations about the termination of STAR+PLUS and other waiver services.  As noted in paragraph 37 above, Section 56 provides a supplemental source of revenue if the STAR+PLUS Cost Cap is exceeded and details a set of standards on which those revenues can be employed.  Because Medicaid services are terminated only if these supplemental revenues are denied, Section 56's legal standards effectively govern the termination of Medicaid services as well.  Thus, denial of supplemental funding under Section 56 must be subject to the Medicaid fair hearing requirements detailed in paragraph 55 above.

58.     This Court decided this very issue in its February 10, 2010, decision in *Knowles v. Horn*, Civ. No. 3:08-cv-1492-K, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010).  There this Court held as follows: "[Section 56][3] . . . added an additional source of funding to supplement HCS funds.  This additional source of funding through state general revenue is inextricably intertwined with the underlying Medicaid funds.  The standards Defendants used to evaluate whether or not to deny state general revenue funds under [Section 56] therefore effectively governed whether [Plaintiff] would receive HCS funds as well.  Because the determinations made with respect to the various funding sources are inseparable, the Medicaid fair hearing requirements apply to [Section 56] state general revenue funds."  *Id.* at *6. There is no material difference between the issue thus decided by this Court in the *Knowles* case and the due process issue in the case at hand.

---

[3] Please see footnote 1 above.

59.    In  October 4, 2012, correspondence to Matthew's counsel, Elise Mitchell, Paul Leche, Special Counsel for Appeals at HHSC, noted that "Health and Human Services Commission does not offer a fair hearing to contest this decision" because the decision "does not regard a Medicaid program, but rather state general revenue[.]"  Defendants thus totally disregarded this Court's dispositive decision in the *Knowles* case.

## VI.    Matthew's Income and Inability to Post Bond

60.    Plaintiff's only income is $1,197.00 per month from child support.  Thus, he is unable to post bond or  other security for purposes of seeking the relief requested in this Complaint.

# COUNT I:
# VIOLATIONS OF THE ADA AND SECTION 504

61.    Plaintiff incorporates by reference paragraphs 1-60 as set forth above.

62.    DADS and HHSC are public entities within the meaning of that term under Title II of the ADA.

63.    DADS and HHSC are recipients of federal funds within the meaning of that term under Section 504.

64.    Matthew is a qualified individual with a disability under the ADA, has a "disability" within the meaning of 29 U.S.C. § 705(9), and is otherwise a qualified individual under Section 504.

65.    Matthew's home constitutes the most integrated, least restrictive, and least confining setting for him.

66.     Defendants' acts constitute unlawful discrimination under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and violate the integration mandate of the regulations implementing these statutory prohibitions against discrimination, 28 C.F.R. §§ 35.130(d) and 41.51(d).

67.     Defendants' acts will cause Matthew irreparable injury for which there is no adequate remedy at law.

# COUNT II:
# VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983

68.     Plaintiff incorporates by reference paragraphs 1-67 as set forth above.

69.     Matthew's eligibility for and receipt of Medicaid services creates a property right subject to due process protection under the Fourteenth Amendment to the Constitution of the United States and under Article I, § 19, of the Texas Constitution.

70.     Texas' STAR+PLUS waiver program specifically provides for a fair hearing as required by 42 C.F.R. Part 431, subpart E, to Medicaid recipients who are denied waiver program services.

71.     Defendants have not provided Matthew the necessary procedural protections and have not provided him with the requisite fair hearing.

72.     By denying Plaintiff the opportunity for a fair hearing to challenge the termination of the STAR+PLUS waiver services necessary to his survival and the denial of the funding that would have allowed such services to continue, Defendants have violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, Article I, § 19, of the Texas Constitution, federal Medicaid law and regulations, and the terms of Texas' STAR+PLUS waiver program.

73.     Defendants are state actors and liable for the violations of federal constitutional and statutory law pursuant to 42 U.S.C. § 1983.

74.     Defendants' acts will cause Matthew irreparable injury for which there is no adequate remedy at law.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.     That this Court assume jurisdiction of this cause;

B.     That this Court enter a declaratory judgment that

(a) Defendants' denial of funding for nursing services for Matthew Rogers in his home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and their implementing regulations, 28 C.F.R. §§ 35.130(d), and 41.51(d); and

(b) Defendants' failure to offer Plaintiff a fair hearing and an opportunity to appeal Defendants' decision to deny him state general revenue funding and to terminate his STAR+PLUS services without such a hearing violated his due process rights;

C.     That this Court enter a preliminary and permanent injunction enjoining Defendants from denying funding for nursing services for Matthew Rogers in his home;

D.     That this Court issue a temporary restraining order, directed to Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, restraining them from the termination of Matthew Rogers' life-sustaining nursing services through the STAR+PLUS program, such temporary restraining order to remain in effect until hearing may be held on his application for preliminary injunction;

E.      That this Court set a prompt hearing on Matthew's motion for preliminary injunction restraining Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, from terminating Matthew's nursing services through the STAR+PLUS program until he is provided a fair hearing and any available administrative appeals and, should the result of that hearing and those appeals be adverse, until he has exhausted his judicial remedies;

F.      That this Court, upon final trial of this matter, make the preliminary injunction permanent;

G.      That this Court award Plaintiff his costs and fees, including reasonable attorneys' fees; and

H.      That this Court grant such additional relief as it deems equitable and just.

Dated:  October 10, 2012

Respectfully Submitted,

 /s/ Mark Whitburn

**Attorneys for Plaintiffs**

**Mark Whitburn**
Texas Bar No. 24042144
**Whitburn & Pevsner, PLLC**
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (817) 592-3488
Fax: (512) 519-2098
mwhitburn@whitburnpevsner.com


**Garth Corbett**
Texas Bar No. 04812300
**Sean A. Jackson**
Texas Bar No. 24057550
**Elise Mitchell**
Texas Bar No. 01478720
**Disability Rights Texas**
7800 Shoal Creek Blvd., Suite 171-E
Austin, Texas 78757
Tel: (512) 454-4816
Fax: (512) 323-0902
gcorbett@disabilityrightstx.org

## VERIFICATION

THE STATE OF TEXAS     §

                                §

COUNTY OF DALLAS     §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Karen Brown, Guardian of Matthew Rogers, who, in her capacity as Guardian, after being by me duly sworn, upon her oath stated that she has personal knowledge of the facts concerning Matthew Rogers stated in the foregoing Plaintiff's Original Verified Complaint and that each and every statement of fact concerning Matthew Rogers contained in that Original Verified Complaint is true and correct.



Karen Brown, Guardian of Matthew Rogers

SUBSCRIBED AND SWORN TO BEFORE ME on the \\th day of October, 2012, to certify which witness my hand and official seal.

CYNTHIA J. BROWN
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 12-17-2013

Notary Public in and for the State of Texas

25